# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDDIE HARRIS,<br><br>    Plaintiff,<br><br>    v.<br><br>HASKY, et al.,<br><br>    Defendants.<br>_____/ | Case No. 1:12-cv-01426-LJO-SKO (PC)<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR FAILURE TO EXHAUST BE GRANTED<br><br>(Doc. 29)<br><br>TWENTY-DAY OBJECTION DEADLINE |

**Findings and Recommendations on Defendants' Exhaustion Motion**

**I.  Procedural History**

Plaintiff Eddie Harris ("Plaintiff"), a state prisoner proceeding pro se and in forma pauperis, filed this civil rights action pursuant to 42 U.S.C. § 1983 on August 30, 2012.  This action is proceeding on Plaintiff's second amended complaint against Defendants Hasky and Beltran ("Defendants") for violating Plaintiff's right to personal safety under the Eighth Amendment of the United States Constitution while he was at Avenal State Prison.  (Docs. 11, 15.)

On May 8, 2014, Defendants filed a motion for summary judgment based on Plaintiff's failure to exhaust the available administrative remedies in compliance with 42 U.S.C. § 1997e(a). Fed. R. Civ. P. 56(c); *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc), *cert. denied*, 135 S.Ct. 403 (2014).  (Doc. 29.)  Plaintiff filed an opposition on June 13, 2014, Defendants filed

a reply on June 27, 2014, and the motion was submitted on the record without oral argument pursuant to Local Rule 230(*l*).[1]  (Docs. 31, 34.)

## II.  Legal Standard

### A.  Statutory Exhaustion Requirement

Pursuant to the Prison Litigation Reform Act of 1995, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  This statutory exhaustion requirement applies to all inmate suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983 (2002) (quotation marks omitted), regardless of the relief sought by the prisoner or the relief offered by the process, *Booth v. Churner*, 532 U.S. 731, 741, 121 S.Ct. 1819 (2001), and unexhausted claims may not be brought to court, *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910 (2007) (citing *Porter*, 534 U.S. at 524).

The failure to exhaust is an affirmative defense, and the defendants bear the burden of raising and proving the absence of exhaustion. *Jones*, 549 U.S. at 216; *Albino*, 747 F.3d at 1166. "In the rare event that a failure to exhaust is clear from the face of the complaint, a defendant may move for dismissal under Rule 12(b)(6)." *Albino*, 747 F.3d at 1166.  Otherwise, the defendants must produce evidence proving the failure to exhaust, and they are entitled to summary judgment under Rule 56 only if the undisputed evidence, viewed in the light most favorable to the plaintiff, shows he failed to exhaust. *Id.*

### B.  Summary Judgment Standard

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); *Albino*, 747 F.3d at 1166; *Washington Mut. Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).

---

[1] Plaintiff was provided with contemporaneous notice of the requirements for opposing a summary judgment motion for failure to exhaust administrative remedies. *Stratton v. Buck*, 697 F.3d 1004, 1008 (9th Cir. 2012); *Woods v. Carey*, 684 F.3d 934, 939-41 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 960-61 (9th Cir. 1998). (Doc. 29.)

Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, although it is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

The defendants bear the burden of proof in moving for summary judgment for failure to exhaust, *Albino,* 747 F.3d at 1166, and they must "prove that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy," *id.* at 1172. If the defendants carry their burden, the burden of production shifts to the plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* "If the undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56." *Id.* at 1166. However, "[i]f material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id.*

**III.   Discussion**

   **A.   Description of CDCR's Administrative Remedy Process**

Plaintiff is a state prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), and CDCR has an administrative remedy process for inmate grievances. Cal. Code Regs. tit. 15, § 3084.1 (2014). Compliance with section 1997e(a) is mandatory and state prisoners are required to exhaust CDCR's administrative remedy process prior to filing suit in federal court. *Woodford v. Ngo*, 548 U.S. 81, 85-86, 126 S.Ct. 2378 (2006); *Sapp v. Kimbrell*, 623 F.3d 813, 818 (9th Cir. 2010). The administrative remedy process is initiated by submitting a CDCR Form 602 "Inmate/Parolee Appeal" within thirty calendar days (1) of the event or decision being appealed, (2) upon first having knowledge of the action or decision being appealed, or (3)

upon receiving an unsatisfactory departmental response to an appeal filed. Tit. 15, §§ 3084.2(a), 3084.8(b)(1) (quotation marks omitted). The appeal must "describe the specific issue under appeal and the relief requested," and the inmate "shall list all staff member(s) involved and shall describe their involvement in the issue." § 3084.2(a). Furthermore, the inmate "shall state all facts known and available to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee Appeal Form, and if needed, the Inmate Parolee/Appeal Form Attachment." § 3084.2(a)(4). Inmate appeals are subject to cancellation if "time limits for submitting the appeal are exceeded even though the inmate or parolee had the opportunity to submit within the prescribed time constraints." § 3084.6(c)(4).

### B. Summary of Allegations Underlying Plaintiff's Eighth Amendment Claim

The events giving rise to Plaintiff's Eighth Amendment claim occurred between August 2011 and January 11, 2012. In August 2011, Plaintiff unsuccessfully tried to persuade his friend and fellow kitchen worker, inmate Ben Taylor, to seek help because Mr. Taylor's medication had stopped working and he was working himself into rages. Mr. Taylor would comment about their supervisor, saying she was an "abomination" and should not be "breathing good air." (Doc. 11, 2nd Amend. Comp., court record p. 4.)

Concerned, Plaintiff subsequently approached their supervisor, Defendant Hasky, on September 13, 2011, and requested that she call Dr. Scott because Mr. Taylor was in trouble and needed help. At Defendant Hasky's prompting, Plaintiff explained what had been going on with Mr. Taylor.

Defendant Hasky subsequently summoned Plaintiff back to her office, told him she was uncomfortable with what he told her, "tore" into him, and called him names. (*Id.*, p. 6.) Defendant Beltran entered the office and watched as Defendant Hasky "tore" into Plaintiff, screaming that he would be sorry. (*Id.*)

The next day, Defendant Hasky asked inmate Crockett to take a walk with her. Within five minutes of their return, inmate Crockett called Plaintiff into the mop room and warned him that he was scaring Hasky and Beltran, who were both female, and if he came near either one of them, they would trigger their alarms, which would cause other officers to watch Plaintiff more closely.

4

1 Plaintiff said he understood the message and left the mop room. Defendants Hasky and Beltran
2 then waved inmate Crockett into the office.

3       On September 15, 2011, Plaintiff was knocked into the pan rack by a blow to his head. As
4 he regained his balance, inmate Crockett was pulling a pan and lid from the rack and walking
5 away. Later on, Plaintiff learned inmate Crockett had been promoted to lead man, and when
6 Plaintiff was walking with an armful of pans, he felt a blow land between his shoulder blades,
7 which knocked him forward and off balance. When he regained his balance, inmate Crocket was
8 standing there with a pan lid in his hand, waiting for Plaintiff to say or do something. Plaintiff
9 walked away.

10       Plaintiff began having trouble sleeping and on September 16, 2011, at approximately 3:30
11 a.m., Plaintiff began experiencing heart attack symptoms. Plaintiff took a nitrostat, which dulled
12 the pain, and he headed for breakfast at 6:30 a.m. The pain worsened and Plaintiff told the
13 building officer he was having a heart attack. Plaintiff was taken to the hospital, where he
14 underwent surgery.

15       Plaintiff returned to the prison on September 24, 2011, and was given a lay-in for seven
16 days. On October 3, 2011, Plaintiff went back to work with a three-month light duty chrono.
17 While Plaintiff was washing dishes, inmate Crockett hit him in the back of the head with a cake
18 pan and then placed it on the pan rack a few feet away. Later on, inmate Crockett walked straight
19 into him as if he were not there.

20       Plaintiff began looking for a new job on October 4, 2011, but no one was hiring. Plaintiff
21 learned there was an opening for the same position he currently held in the kitchen during the
22 evening shift. Plaintiff spoke with the morning supervisor, Officer Jackson, who told Plaintiff he
23 knew Plaintiff was a good worker and he would hire Plaintiff but he did not want Defendant
24 Hasky to know until after the reassignment. Officer Jackson said he would talk to Defendant
25 Beltran and get her on board.

26       The next day, as Plaintiff handed Defendant Beltran his ID card, she told him Officer
27 Jackson talked to her and she told him, "Okay." (*Id.*, at 8.) That day the physical harassment
28 worsened, and Plaintiff was pushed into objects numerous times, injuring him.

Plaintiff talked to Officer Jackson on October 6, 2011, and his demeanor had changed. Officer Jackson told Plaintiff that because Plaintiff had a pay number and he did not have any pay numbers, it would complicate things but he would ask around to see if any of his workers wanted to swap.  That evening, Defendant Beltran approached Plaintiff and asked him what was up with his job change, causing him to wonder if she had told Defendant Hasky, who then blocked the change.  Inmate Crockett subsequently rammed a table into Plaintiff from behind, right in front of the office where Defendants Hasky and Beltran were watching.  Plaintiff realized then that inmate Crocket had been given permission, or had been told, to harass Plaintiff.

Plaintiff alleges that he wanted to go to Dr. Scott and tell her what was happening, but he had been told by Defendants Hasky and Beltran that all the staff members were "close" and he feared if they found out, they would have him "taken care of."  (*Id.*, at 9.)  Plaintiff alleges that Defendants Hasky and Beltran used gang members to do their bidding, and he was not nor had he ever been a gang member.

On October 12, 2011, Plaintiff apologized to Defendants Hasky and Beltran "for being repulsive to them," and they accepted his apology.  (*Id.*)  Shortly thereafter, Defendant Hasky approached Plaintiff and asked if he still wanted the job change to the morning shift.  Plaintiff said yes but Defendant Hasky made it clear it was not going to happen.  (*Id.*)  Plaintiff then went through the day trying to dodge the lead man, inmate Crockett, and do his job.

On October 13, 2011, the lead man clipped Plaintiff's elbow as he left the restroom and sneered at him.  Plaintiff alleges that he was constantly stressed and felt weak from his health problems and blood pressure medication.  Plaintiff also alleges he was in CCCMS[2] and in his late fifties while inmate Crockett was in his thirties and in good health, but the staff did not care.

On October 14, 2011, there was a substitute supervisor in the kitchen who offered Plaintiff and the rest of the crew some extra hot links.  Plaintiff accepted the offer and went into the refrigerator with her, where he saw inmate Crockett.  The supervisor began looking for the other

---

[2] CCCMS, or Correctional Clinical Case Management System, provides the lowest level of psychiatric care for mentally ill inmates.  *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1069 (9th Cir. 2013); *Coleman v. Brown*, 28 F.Supp.3d 1068, 1074-75 (E.D.Cal. 2014).

6

inmates' stashes.  Plaintiff declined the offer of extra hot links since the supervisor was looking to get them from others inmates.

Subsequently, inmate Crockett summoned Plaintiff into the clerks' office, where Crockett accused him of having the supervisor go through inmates' stashes and told him he needed to know his place.  As inmate Crockett took off his glasses, Plaintiff saw Defendant Beltran watching and he backed out of the office as inmate Crockett yelled at him to get back in there.

On October 22, 2011, Plaintiff went to the shot caller for the Bloods, inmate Crockett's gang, told him everything, and asked for his help.  The shot caller agreed to help and Plaintiff was not bothered at work on October 23, 2011.

On October 24, 2011, Plaintiff overheard Defendant Hasky say his name and inmate Crockett tell her, "My people told me to back off."  (*Id.*, p. 11.)  Defendant Hasky told him not to worry because she had his back.

On October 27, 2011, things changed and inmate Crockett kept watching him and going into the office.  Plaintiff overheard him telling Defendants Hasky and Beltran that Plaintiff was watching them in a mean way.

The next day, Plaintiff began being physically abused by guys on the yard and in the dorm he did not know.

On November 6, 2011, when Defendant Beltran was off, Plaintiff asked Officer Tirado for a job change and he received one.  That night, Plaintiff received a ducat to see Dr. Scott, the psychologist, and he told her what was happening.  Dr. Scott asked Plaintiff if he knew how to fight and he told her that after he was baptized, he vowed to God there would be no more violence.

Plaintiff then reported to work and informed Officer Tirado what Defendant Hasky had done to him and that he was in danger.  After Plaintiff went to his work area, Officer Tirado called him back to the office and told him she had informed her sergeant, who told her to call the lieutenant.  Plaintiff said he would be killed if any of Defendant Hasky's people found out he told.  Officer Tirado said she had to cover herself and she was going to send him back to his building.  Officer Tirado escorted him out and told him not to come to work the next day.

1 Plaintiff got a new job as a dorm porter but on November 7, 2011, and thereafter, Defendant Hasky made a point of rushing into whichever dining hall he tried to eat in and staring him down. On or around December 27, 2011, as Plaintiff was approaching to pick up his meal tray, Defendant Hasky told Officer Block, "I'd better leave, because I can't stand the sight of him." (*Id.*, p. 13.) The next day one of Plaintiff's building officers told two other staff members that Plaintiff was gay and she got the information from someone who "was an authority on those things." (*Id.*)

The next day, inmates acquainted with Defendant Hasky and inmate Crockett started walking by Plaintiff using sexually explicit language toward him, and later that day, an inmate known to be violent grabbed his rear end while he was brushing his teeth. That night at dinner, inmate Crockett sneered and laughed at him, and he overheard a Bloods gang member tell another inmate that word came down from Defendant Hasky that Plaintiff was a punk.

On January 2, 2012, one of Plaintiff's former co-workers told him in private that he better "roll up" because he was in danger. (*Id.*) Plaintiff tried to hang in there until he appeared for a classification hearing later that month but on January 19, 2011, as he was leaving the canteen, two Bloods approached him and one tried to take his canteen purchases, ostensibly because Plaintiff owed him. Plaintiff managed to get away and when he was called to the psychologist's officer for a committee meeting, Plaintiff said he wanted to go to the Sensitive Needs Yard for protection.

C.     **Defendants' Argument in Support of Summary Judgment**

Defendants move for summary judgment on the ground that Plaintiff did not properly exhaust the administrative remedy process, entitling them to judgment. Between September 13, 2011, and August 30, 2012, Plaintiff filed only one non-healthcare related inmate appeal, log number ASP-12-00290. (Doc. 29-3, Motion, Donaldson Dec., ¶4.) The appeal was received by the appeals office on March 7, 2012, and it concerned Plaintiff's complaint that inmate Crockett attacked him at the behest of Defendants Hasky and Beltran on September 14 and 15, 2011. (*Id.*, Donaldson Dec., ¶5 & Ex. B.) On March 9, 2012, the appeal was screened out and cancelled as untimely, but because the appeal concerned staff misconduct, an inquiry was conducted at the second level of review. (*Id.*) Plaintiff was informed of the cancellation and inquiry by letter on

8

March 9, 2012. (*Id.*) Plaintiff did not submit any other appeals, and although Plaintiff submitted the cancelled appeal to the third and final level of review on April 29, 2012, it was rejected on May 29, 2012, because it was a cancelled appeal. (Donaldson Dec., ¶6 & Ex. B; Doc. 29-4, Zamora Dec., ¶¶6, 8.)

### D.     Plaintiff's Opposition Argument

In opposition, Plaintiff argues the documentation relating to his appeal shows how he "could be confused with the appeals process." (Doc. 31, Opp., p. 1.) Plaintiff's appeal, dated March 6, 2012, was received on March 7, 2012, and he explained in the appeal that he had been threatened. Plaintiff contends his appeal was accepted at the second level of review and he again explained he had been threatened. Plaintiff was dissatisfied with the second appeal level and submitted his appeal to the third level, again explaining that he had been threatened. Plaintiff contends he tried to wait for his property so he could show the appeals office why he was late, and he was confused why the appeal was accepted at the second level only to be changed by Counselor Ramirez the same day.

### E.     Findings

#### 1.     Evidence from Appeals Process

On March 6, 2012, Plaintiff submitted an inmate appeal in which he identified "Attempted murder by staff and inmate – and threats" as the subject. (Opp., p. 6.) Plaintiff noted there was not enough space on the form; and he stated that inmate Crockett accosted him on September 14, 2011, and September 15, 2011, on behalf of Hasky and Beltran and that he was struck at least twice a day. (*Id.*) Plaintiff included an "Inmate/Parolee Appeal Form Attachment" in which he detailed more of the events that transpired; and he stated that Lt. Turner, Sgt. Jackson, and another sergeant went through his property, found six witness affidavits, and placed a hold on his property to prevent him from filing charges. (*Id.*, p. 8.) Plaintiff also stated that he had been threatened by staff. (*Id.*) For relief, Plaintiff sought to get his property back and for justice from the system, as more than seventeen rules and numerous state and federal laws were broken. (*Id.*, p. 6.) Plaintiff indicated he was not attaching any supporting documents because staff placed a hold on his property. (*Id.*)

Plaintiff was notified by letter dated March 9, 2012, that his appeal was cancelled because he failed to submit it within the prescribed time constraints despite having the opportunity to do so. However, the Hiring Authority ordered an inquiry into the conduct based on Plaintiff's allegations. (Opp., p. 4.) Plaintiff's appeal form itself reflects the appeal was both bypassed at the first level of review and rejected on March 9, 2012, for "time." (*Id.*, p. 6.) The second level review section of the form has a line through it with the word "void" written across it. (*Id.*, p. 7.) The notice at the bottom of the letter informed Plaintiff that he cannot resubmit a cancelled appeal but he may file a separate appeal on the cancellation decision and if the cancellation appeal is granted, he may then resubmit the original appeal. (*Id.*, p. 4.)

Plaintiff completed the section of the form for dissatisfaction with the second level and dated it April 29, 2012. (*Id.*, p. 7.) Plaintiff stated that he was threatened by staff and another inmate as to what would happen to him if he did anything like file a 602 against staff, that he received his property two months after it had been packed, and that he discovered five sworn affidavits and his case writ had been removed. (*Id.*) Plaintiff sent a request to Lt. Turner for the return of those documents on April 8, 2012, but he received no reply. (*Id.*, pp. 7, 9.) Plaintiff also stated that someone in appeals notified the Yard 2 sergeant of his complaint, which is against regulations. (*Id.*, p. 9.)

In a letter dated May 29, 2012, Plaintiff was informed by the Office of Appeals, which conducts the third and final level review of inmate appeals, that he was attempting to submit an appeal that was cancelled, which was considered an abuse of the appeals process. (*Id.*, p. 5.)

### 2. Availability of Administrative Remedy Process

There is no dispute that there is an "existing and generally available" administrative remedy process for state prisoners, but Defendants are not entitled to judgment if the Court determines that the administrative remedy process was effectively unavailable to Plaintiff. *Williams v. Paramo*, __ F.3d __, __, 2015 WL 74144, at *7 (9th Cir. Jan. 7, 2015); *Albino*, 747 F.3d at 1172. In this case, Plaintiff filed an appeal that was received by the appeals office, and therefore, the Court employs a two-part test to determine whether the administrative remedies were effectively unavailable. *Sapp*, 623 F.3d at 823-24.

First, the Court must first determine whether Plaintiff's appeal would have sufficed to exhaust his Eighth Amendment claim against Defendants Hasky and Beltran. An appeal "suffices to exhaust a claim if it puts the prison on adequate notice of the problem for which the prisoner seeks redress," and "the prisoner need only provide the level of detail required by the prison's regulations." *Sapp*, 623 F.3d at 824; *accord Wilkerson v. Wheeler*, 772 F.3d 834, 839-40 (9th Cir. 2014). CDCR's regulations require a description of "the specific issue under appeal and the relief requested," and a description of the staff members involved and their involvement. § 3084.2(a). The Court finds that appeal log number log number ASP-12-00290 placed prison officials on notice of the "specific issue" and the staff involved, § 3084.2(a), and no argument to the contrary was made.

Next, the inquiry turns to whether staff misconduct or other events rendered the administrative remedy process effectively unavailable. *Williams*, __ F.3d at __, 2015 WL 74144, at *7; *Sapp*, 623 F.3d at 822-23. In this case, Plaintiff raises the argument that he was unable to file his appeal within the time constraints because he feared for his safety if he did so and he was threatened. *See Williams*, __ F.3d at __, 2015 WL 74144, at *7; *Sapp*, 623 F.3d at 822-23. However, in recognition of the fact that exhaustion requirements are designed to deal with parties who do not want to exhaust, "proper exhaustion" of the administrative remedies is required and "proper exhaustion" demands compliance with an agency's deadlines and other critical procedural rules. *Ngo*, 548 U.S. at 90-91 (quotation marks omitted).

In this case, Plaintiff filed an inmate appeal but it was untimely. The alleged threats against Plaintiff are relevant to the issue of why the appeal was untimely, *see Williams*, __ F.3d at __, 2015 WL 74144, at *7; *Sapp*, 623 F.3d at 822-23, but the administrative remedy process provides staff with the discretion to determine whether the inmate had the opportunity to submit a timely appeal and it allows staff to excuse late appeals or to reinstate cancelled appeals, §§ 3084.6(a)(3)-(4), (c)(4). A cancellation decision may be challenged, § 3084.6(e), and in the cancellation letter dated March 9, 2012, Plaintiff was specifically informed in writing as follows: "Pursuant to CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a separate appeal can be filed on the cancellation decision. The original

11

appeal may only be resubmitted if the appeal on the cancellation is granted." (Opp. p. 4.) Plaintiff elected to resubmit the cancelled appeal despite the clear prohibition against that course of action and in disregard of the regulations, which afforded him the opportunity to appeal the cancellation decision as wrongful given his position that the appeal was late because he felt intimidated. Plaintiff may not benefit from a purported unavailability of administrative remedies where he disregarded the procedural rules of which he was on notice and which could have afforded him relief from the cancellation of his appeal.

Plaintiff's argument that he was confused by the process lacks merits in light of the cancellation letter, which clearly articulated the cancellation, the basis for the cancellation, and the recourse available to Plaintiff under the applicable regulation. § 3084.6(c)(4), (e). Similarly, Plaintiff's argument that he lacked access to his property is unavailing, as Plaintiff's appeal was not rejected for lack of supporting documentation. Finally, Plaintiff's argument that he was afraid to file the appeal any earlier due to staff intimidation is of no assistance under the particular circumstances he confronted; he filed an appeal but then failed to take the next available step to him under the applicable regulations.[3] § 3084.6(c)(4), (e); *Ngo*, 548 U.S. at 90-91.

In sum, Plaintiff was required to properly exhaust by complying with the rules and regulations, there was an administrative remedy process available to him of which he was on notice, and his failure to properly exhaust that available process entitles Defendants to judgment for failure to exhaust. § 3084.6(c)(4), (e); *Ngo*, 548 U.S. at 90-91.

## IV. Recommendations

Accordingly, based on the foregoing, the Court HEREBY RECOMMENDS that Defendants' motion for summary judgment for failure to exhaust, filed on May 8, 2014, be GRANTED.

---

[3] With respect to the inmate declarations submitted by Plaintiff regarding threats, the declarants must have personal knowledge of any threats made against Plaintiff regarding use of the inmate appeals process. Fed. R. Evid. 702. Despite the low threshold, it does not appear that the witnesses possess personal knowledge of the facts for which their declarations are offered. *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1045 (9th Cir. 2013). Regardless, Plaintiff's verified opposition is sufficient to constitute evidence that he was threatened. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004). The Court need not reach the issue of what level of specificity is required to create a disputed issue of material fact regarding staff misconduct rendering the process unavailable, however, because in this case, the relevant issue involves events which occurred after Plaintiff filed his inmate appeal on March 6, 2012. *Sapp*, 623 F.3d at 822-23.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **twenty (20) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  Local Rule 304(b).  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Responses, if any, are due within **ten (10) days** from the date the objections are filed.  Local Rule 304(d).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson*, 772 F.3d at 838-39 (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **February 17, 2015**                    **/s/ Sheila K. Oberto**
                                                                                  UNITED STATES MAGISTRATE JUDGE